

FILED by DJ D.C.
ELECTRONIC
April 25,2013
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

# 13-80412-CIV-MIDDLEBROOKS/ BRANNON

TARA MEHRBACH

Plaintiff,

vs.                                              CASE NO. _____

A.G. NEWMYER III
2355 Marseilles Drive
Palm Beach Gardens, FL 33410

JEFFREY FISHER
501 South Flagler Drive, Suite 450
West Palm Beach, FL 33401

ODETTE MARIE BENDECK
501 South Flagler Drive, Suite 450
West Palm Beach, FL 33401

FISHER & BENDECK, PL
501 South Flagler Drive, Suite 450
West Palm Beach, FL 33401

DR. CHRISTOPHER BARDEN
3605 West 55th Street
Edina, MN 55410

Defendants.

## COMPLAINT FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, CIVIL CONSPIRACY TO INTENTIONALLY INFLICT EMOTIONAL DISTRESS, FALSE LIGHT INVASION OF PRIVACY, INVASION OF PRIVACY, DEFAMATION, ABUSE OF PROCESS, MALICIOUS PROSECUTION, PERJURY, AND OTHER RELIEF

Plaintiff, Tara Mehrbach ("Ms. Mehrbach"), sues individual Defendants Arthur
G. Newmyer III, Odette Bendeck, Jeffrey Fisher, Dr. Christopher Barden and the law
firm of Fisher & Bendeck, PL and alleges:

## JURISDICTION AND VENUE

1. This is a civil action for relief pursuant to section 28 U.S.C. § 1332, *et seq* and for an amount in controversy in excess of Seventy-Five Thousand Dollars ($75,000). The Court has jurisdiction of this action by virtue of diversity of citizenship between the parties.

2. A substantial part of the events giving rise to this action occurred in Palm Beach County, Florida, in that the events or omissions occurred in Palm Beach County, Florida or where occurring elsewhere, their effects occurred in Florida, the complaints upon which the declaration of rights is sought were filed in the 15th Judicial District in and for Palm Beach County, Florida, and the majority of violations alleged in the complaint occurred in Palm Beach County, Florida.

3. Venue is therefore appropriate in the Southern District of Florida, West Palm Beach Division, pursuant to 28 U.S.C. § 1391.

## PARTIES

4. Plaintiff Tara Mehrbach is an individual who, throughout all relevant times was residing in Chevy Chase, MD and/or Washington, DC.

5. Defendant A. G. Newmyer III ("Newmyer") is an individual residing at all relevant times in Palm Beach Gardens the State of Florida. Newmyer was previously married to the Plaintiff.

6. Defendant Jeffrey Fisher ("Fisher") individually, is a lawyer authorized to practice law in the State of Florida. Fisher is a named partner in the law firm of Fisher & Bendeck, PL and at all relevant times was serving as an attorney to Defendant Newmyer in the Florida divorce and custody action.

7. Defendant Odette Marie Bendeck ("Bendeck") individually, is a lawyer authorized to practice law in the State of Florida. Bendeck is a named partner in the law firm of Fisher & Bendeck, PL and at all relevant times was serving as an attorney to Defendant Newmyer in the Florida divorce and custody action.

8. Defendant Fisher & Bendeck, PL ("Fisher & Bendeck") is a law firm with its primary place of business in West Palm Beach in the State of Florida. Fisher & Bendeck was at all relevant times serving as the law firm representing Defendant Newmyer in the Florida divorce and custody action.

9. Defendant Dr. Christopher Barden ("Barden") is an attorney and a psychologist. Upon information and belief, Dr. Barden is a resident of the State of Minnesota. Dr. Barden served as an expert witness in the field of psychology on behalf of Defendant Newmyer in the Florida family law matter and additionally served as

2

an advisor to Newmyer in the Sidwell litigation during the relevant time period.

## NATURE OF THE COMPLAINT

10. Beginning in the summer of 2009 and going through today, Newmyer committed perjury and each of the Defendants knowingly and willfully failed to notify the family court of that perjury and in so doing conspired and agreed among themselves to maliciously and wrongfully:

- Deprive Ms. Mehrbach of access to and the enjoyment of her children;

- Destroy the reputation and earning potential of Ms. Mehrbach;

- Take Ms. Mehrbach's cash assets, investment assets and real property;

- Control Ms. Mehrbach's behavior particularly with respect to her personal life; and

- Inflict as much emotional pain and suffering on Ms. Mehrbach as possible.

## FACTUAL ALLEGATIONS

11. In August 2009 Ms. Mehrbach and Defendant Newmyer separated after eight years of marriage and the birth of two female children.

12. On August 20, 2009 the parties entered into a marital separation agreement ("MSA") attached hereto as Exhibit A.

13. The MSA provided that Ms. Mehrbach would relocate to the Washington, DC area to raise the children, the children would reside primarily with her, and that they would attend the Sidwell Friends School as most Washington based Newmyers had for generations.

14. Ms. Mehrbach did relocate to the Washington, DC area in August 2009 and Newmyer returned to his home in Palm Beach Gardens although neither party was then moving for a divorce.

15. The older Newmyer daughter, LN, enrolled at the Bethesda, MD lower school campus of the Sidwell Friends School.

16. In mid-November 2009, Ms. Mehrbach saw emails between Newmyer and a woman Newmyer eventually admitted was his lover, Mrs. Stubbs. Ms. Mehrbach

3

also found cellular telephone records of calls between Newmyer and Mrs. Stubbs dating back many months before the separation in August 2009.

17. Upon information and belief, Mrs. Stubbs is, and was at all relevant times, married to another man.

18. After Ms. Mehrbach confronted Newmyer with the e-mails, Newmyer told Ms. Mehrbach he wanted a divorce.

19. Within hours of Ms. Mehrbach discovering the affair between Newmyer and Mrs. Stubbs, Newmyer told Ms. Mehrbach, "I have already talked to Jeff Fisher and he guaranteed me I will get the children back in Florida."

20. In late January, early February of 2010, Ms. Mehrbach began a relationship with Dr. Jack Huntington, then a counselor at the Sidwell middle school that is located in Washington, DC several miles away from the Bethesda, Maryland based lower school which LN attended.

21. Dr. Huntington and Ms. Mehrbach each had a female child in the pre-kindergarten class at the lower school.

22. Newmyer's reaction upon learning of the relationship between Ms. Mehrbach and Dr. Huntington was extreme and outrageous. Newmyer became severely agitated, aggressive, and threatened violence against Ms. Mehrbach. Newmyer's own sister, Barbara Johnson, stated shortly before her death in July of 2010 that she felt that her brother, Mr. Newmyer, had "lost it".

23. Ms. Mehrbach reported the threats of violence to their couple's therapist, Dr. Winer, to Newmyer's psychiatrist, Dr. David Goldstein, and to others.

24. Newmyer filed for divorce in Palm Beach County, Florida in June of 2010 and sought to enforce the MSA.

25. Defendants began to execute their conspiracy to deprive Ms. Mehrbach of her children, to destroy her reputation, to destroy her ability to earn a living, and to cause her emotional distress. The execution involved perjury, obstruction of legitimate discovery efforts, misrepresentations to the court, and other actions and omissions.

26. At the time Newmyer filed for divorce, the children had been living primarily with Ms. Mehrbach in Maryland for 10 months. They had attended Maryland schools since September 2009, visited Maryland/Washington, DC doctors and dentists, and performed their extracurricular activities in Maryland.

27. Other than a couple of brief vacations totaling fewer than fourteen days, the children had not spent any time in Florida between June of 2009 and June of 2010 when Newmyer filed for divorce.

4

28. The MSA provided that the jurisdiction for purposes of the child custody determination would remain Florida regardless where the children resided with the mother.

29. The UCCJEA, as adopted by Florida at Fla. Stat. Sec. 61.514, governs interstate child custody jurisdiction and states in relevant part that:

   (1)  [ ] a court of this state has jurisdiction to make an initial child custody determination <u>only if</u>:

      (a)  <u>This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within 6 months before the commencement of the proceeding</u> and the child is absent from this state but a parent or person acting as a parent continues to live in this state;

30. Florida was not the "UCCJEA" home state of the Newmyer children in June of 2010 because the Newmyer children had not attended school in Florida, regularly slept in Florida, attended extra-curricular activities in Florida, or otherwise demonstrated any indicia of residing in Florida for the one year period prior to Newmyer filing for divorce and custody in Florida.[1]

31. Well established law holds that parties cannot agree in a separation agreement to jurisdiction in a state that otherwise does not properly have jurisdiction over the children.  The MSA entered into between Newmyer and Ms. Mehrbach was not enforceable with respect to the jurisdiction provisions.

32. When Ms. Mehrbach challenged Florida's jurisdiction over the children, Newmyer falsely testified at the jurisdiction hearing, contrary to the language of the written MSA, that Ms. Mehrbach had told him that she was moving to Maryland for one year, temporarily, while Newmyer redid the home in Florida. Newmyer also falsely testified that he had been duped by Ms. Mehrbach's establishing residency in Maryland.

33. The MSA does not say the words "temporary" or "trial basis", "for one year" or in any way provide temporal limits to the relocation and Ms. Mehrbach had no intention to relocate back to Florida.

---

[1] In the year before Newmyer filed for divorce in June of 2010, the approximate calculation of where the children lay their heads at night was:

   4 nights spent in North Carolina
   11 nights spent in Florida
   56 nights spent in Maine
   294 nights spent in Maryland

5

34. The MSA provides for changes in child support and school attendance many years hence.

35. Defendants Fisher, Bendeck and Fisher & Bendeck were aware of the perjury at the time of Newmyer's false testimony with respect to Ms. Mehrbach's "intent" regarding the move to the Washington, DC. Fisher, Bendeck and Fisher & Bendeck were the attorneys representing Newmyer during the negotiations of the MSA.

36. Defendants Fisher, Bendeck and Fisher & Bendeck allowed Newmyer's false testimony to stand without withdrawing as counsel or attempting to clarify the record. Instead, they made false representations to the court regarding the testimony and the MSA, and otherwise furthered the conspiracy to establish jurisdiction in Florida and ultimately to deprive Ms. Mehrbach of her children and to cause her other harm.

37. Despite the clear UCCJEA jurisdiction in the Maryland Courts, Judge Phillips, then sitting on the family division case, relying on Newmyer's false testimony alleging that he was duped, determined that jurisdiction over the children lay in Florida.

38. Newmyer, Fisher, Bendeck and Fisher & Bendeck wrongfully and maliciously used the divorce proceedings in Florida to take the full-day deposition of Dr. Huntington, and to obtain thousands of emails between Dr. Huntington and Ms. Mehrbach from their initial stages of courtship.

39. Counsel for Newmyer took Ms. Mehrbach's full-day deposition as well and asked numerous humiliating and personal questions about her sexual relationship with Dr. Huntington, including questions about specific positions and sex acts.

40. In early 2011, Newmyer sent the entire Board of Sidwell Friends School an "Analysis" he had had performed about Dr. Huntington and the alleged doctor–patient relationship between Dr. Huntington and LN which included many, many explicit personal emails between Dr. Huntington and Ms. Mehrbach. Newmyer demanded the termination of Dr. Huntington and millions of dollars in compensation.

41. Newmyer, Fisher, Bendeck and Fisher & Bendeck set a "temporary relief" hearing in the family matter, then transferred to Judge Amy Smith, for May 18, 2011. The "temporary" relief sought by Newmyer was relocation of the children from Maryland to Florida, removal of the children from their schools, home, mother, friends and extended family, and sole decision making over the children's education decisions.

42. One week before the "temporary relief" hearing, and without consulting Ms. Mehrbach, Newmyer filed a $10 million lawsuit in the District of Columbia on

6

behalf of himself and on behalf of their daughter LN, alleging that Sidwell and Dr. Huntington had harmed him and LN.  (See "Sidwell Complaint" attached hereto as Exhibit B.)

43. In the Sidwell Complaint, Newmyer alleged that Dr. Huntington was LN's psychologist and that Dr. Huntington and Ms. Mehrbach had an inappropriate relationship which violated Dr. Huntington's ethical obligations and which, according to the Complaint, was sanctioned by Sidwell despite Sidwell's "knowledge" that Dr. Huntington was LN's therapist and despite Sidwell's "knowledge" that Ms. Mehrbach was married.  (See paragraphs 12-18, 24, 28-29, 31, 34 of the Sidwell Complaint at Exhibit B.)

44. In the Sidwell Complaint, Newmyer omits his affair with Mrs. Stubbs.

45. In the Sidwell Complaint, Newmyer omits that he had asked Ms. Mehrbach for a divorce before she met Dr. Huntington.

46. In the Sidwell Complaint, Newmyer omits that Ms. Mehrbach alerted Sidwell via a meeting with LN's teachers in early December of 2009 that Newmyer and Ms. Mehrbach were divorcing.

47. Newmyer's made material omissions and material false allegations in the Sidwell Complaint and intentionally and maliciously caused the false complaint with its salacious and embarrassing content to be disseminated as widely as possible.

48. In January 2012 the District of Columbia Board of Psychology concluded that there was no evidence that Dr. Huntington had ever evaluated or treated LN.  (See Exhibit C attached hereto.)

49. In September 2012 the Maryland Board of Psychology concluded that there was no evidence that Dr. Huntington had ever evaluated or treated LN.  (See Exhibit C attached hereto.)

50. To cover up and to further the malicious scheme to deprive Ms. Mehrbach of her children to destroy her reputation, and to cause her other harm, Newmyer committed systemic perjury regarding material facts and key events in the Florida divorce and custody litigation.

51. In addition to filing the false Sidwell Complaint, Newmyer engaged in other malicious activity of which Fisher, Bendeck and Fisher & Bendeck were made aware. Newmyer took to a popular Washington area website, dcurbanmoms.com to vent his anger "anonymously".  (See web thread attached hereto as Exhibit D.) The postings were humiliating, false and damaging to Ms. Mehrbach's reputation and to Dr. Huntington's reputation.

7

52. When asked under oath in the family matter in Florida whether he had ever posted on dcurbanmom or caused anyone to post on dcurbanmom the malicious threads about Ms. Mehrbach and Dr. Huntington, Newmyer falsely testified in an October 18, 2011 deposition held in Florida:

> 24 Q. Have you ever posted on D.C. Urban Mom and
> 25 Dad? I think it has a little subtitle.
> Page 131
> 1 A. No.
> 2 Q. Have you ever known -- let me try this
> 3 another way.
> 4 Have you ever asked someone to post on D.C.
> 5 Urban Moms?
> 6 A. No.
> 7 Q. Have you ever paid anyone to post on D.C.
> 8 Urban Moms?
> 9 A. No.
> 10 Q. Have you ever known the identity, other
> 11 than Tara, of someone who did post on D.C. Urban
> 12 Moms? That's a yes or no question.
> 13 A. No.

Newmyer fought discovery efforts aimed at proving he was the poster of the false and degrading posts, but later admitted to Ms. Mehrbach that he had been the poster when phone records and records from the website indicated that Mr. Newmyer was the poster.

53. Despite the fact that the news media had copies of the false and malicious file-stamped Sidwell Complaint prior to the time it was publicly available on the Court's website, Newmyer repeatedly testified under oath at depositions and in court hearings in the Florida divorce matter that he had never hired anyone to seek PR with respect to the litigation against Sidwell.

54. A mere week after the Sidwell Complaint was filed, Newmyer testified under oath May 18, 2011 in the Florida Court:

> 21     Q.  Has there been media attention surrounding
> 22   that lawsuit?
> 23     A.   There has been some media attention
> 24   surrounding that lawsuit, yes, sir.
> 25     Q.   Did you or any of your agents communicate with
>
> 114
>
> 1   public relations professionals regarding that lawsuit?
> 2     A.   Not that I know of.  I have spoken to no

8

3   reporters about the matter, nor have I sent the
4   Complaint or any other documents to anybody.
5       Q.   Do you know if anyone on your behalf has sent
6   it?
7       A.   Do I know it what?
8       Q.   Has sent it on your behalf to media outlets?
9   **A.   No one has communicated on my behalf with any**
10  **media whatsoever to the best of my knowledge.**

55. Later that year in a deposition conducted by Mr. Uno in Florida on October
    18, 2011, Newmyer contradicted his prior testimony that "no one has
    communicated" on his behalf with the media by saying that on the date the
    Sidwell Complaint was filed a PR firm was fired.

25 Q. Well, give me two more minutes then.
Page 178
1 Have you ever hired a public relations firm
2 in relation to this case or the Sidwell case?
3 A. I authorized members of my team to do
4 whatever they wanted to do to make sure that the
5 false nonsense that Sidwell was saying publicly about
6 the case was counterbalanced by the truth.
7 Q. Do you know if part of that strategy was to
8 hire a public relations team?
9 A. No. I really don't know what the strategy
10 was.
11 Q. Do you know if they ever did hire a public
12 relations team or any public relations professional?
13 A. I learned more recently subsequently that a
14 public relations professional was engaged.
15 Q. Who was that public relations professional?
16 A. I don't know and did not engage the public
17 relations people myself.
18 Q. You have no idea who they are?
19 A. That is true.

* * *

13 Q. Did they do anything else that you know of?
14 A. No. But I -- I was not involved, as I
15 said.
16 Q. Do you know if they sent out any press
17 releases?
18 A. My impression was that they did not.
19 Q. Do you know that for a fact?
20 A. No.

9

21 Q. 21 Q. Do you know -- you have no idea of any
22 other work that they did other than making calls to
23 the press?
24 MR. FISHER: Objection to form.
25 You can answer.
Page 180
1 THE WITNESS: Fine. Thank you. That
2 is correct. I know of no other work that
3 the PR firm did other than making calls to
4 the press. And in fact, I think, the bulk
5 of it was responding to calls from the press
6 as opposed to out reach to the press.
7 BY MR. UNO:
8 Q. Do you know if they are still engaged?
9 A. No, I don't know.
10 Q. Do you know when they were first engaged?
11 A. No.
12 Q. Do you believe it to be prior to when you
13 filed the Sidwell lawsuit?
14 A. No. I believe it to be May 12th, 2011.
15 But I'm not certain.
16 Q. Why does that date stick in your mind?
17 A. That was the day the lawsuit was filed, and
18 that was the day the phone started to ring....

56. Newmyer's sworn (and repeated) testimony regarding the publicity was blatantly
false.  According to Newmyer's own subsequent interrogatory responses in the
Sidwell matter, Newmyer and his agents had hired the firm of Anne Schroeder
Mullins & Co. to disseminate the complaint.  (See relevant discovery responses
attached hereto as Exhibit E).  Ms. Schroeder and her firm made several
arguments to avoid being deposed in the Sidwell matter and failed to show up for
a deposition when they were subpoenaed.  There is further evidence of the falsity
of even that belated admission of hiring a PR firm as Mr. Newmyer met in his
Washington, DC apartment with someone named Anne the weekend before the
lawsuit was filed and locked the Newmyer girls in his bedroom so he could meet
with Anne without them hearing what he was talking about which caused the
Newmyer girls to call their mother crying about being locked in their father's
bedroom.

57. Newmyer acknowledged in discovery in the Sidwell matter that the PR firm did
disseminate the complaint within moments of its filing, and that the PR firm had
communications on his behalf with Washington Post, Washington Examiner,
Washington City Paper, Huffington Post, Drudge Report, New York Times,
National Journal, Politico, The Hill, U.S. News, local and national news stations
including WJLA, WSMV, WUSA, Fox, ABC, CBS and MSNBC.

10

58. Fisher reiterated Newmyer's PR lie to the Court nearly a year later.  A transcript from an April 30, 2012 hearing reads:

> Ms. Mehrbach:  I am absolutely opposed to turning over my psychological records to them given that they took my sexually explicit e-mails between me and my boyfriend which occurred after I was separated from my husband and put them in a press release and sent them with a PR firm around the world.

> The Court:  I remember.

> **Mr. Fisher:  Judge, we dispute that happened, but I can't stop her from saying it.**

59. At that temporary relief hearing held just one week after Newmyer filed the f Sidwell Complaint and had it publicized internationally, Judge Smith admitted she was aware of the Sidwell litigation and publicity surrounding the Sidwell suit.

60. During that May 18, 2011 temporary relief hearing, Newmyer had Dr. Barden, a psychologist expert he had hired, lie to the Court about issues material to a determination whether the children's best interests were served by staying in Maryland with their mother, or returning to Florida to live with Newmyer.

**61.** At the temporary relief hearing, Newmyer's "theme" was that Ms. Mehrbach had shown such poor judgment in having an "affair" with her daughter's therapist, in taking anti-depressants and anti-anxiety medication, and in choosing Sidwell Friends School for their gifted daughter, that the children had to be relocated to Florida to "rescue" them.

62. Newmyer argued that he should be granted authority over education decisions for the children.

63. LN's two years of Sidwell report cards were excellent.  They showed a shy and withdrawn child who, after a rough start, had improved dramatically in terms of adjustment to a new environment.

64. There was also a written report from a team of specialist psychologists hired jointly by Newmyer and Ms. Mehrbach to assess in early 2010 whether Sidwell was the right fit for LN given her precocity.  The written report concluded that LN was among her intellectual equals at Sidwell and had adjusted well after an initial difficult period and that she should remain at Sidwell.  (Jasnow Report attached hereto as Exhibit F.)

65. LN's treating psychiatrist, Dr. Solomon, determined that LN should stay with her mother in Maryland and continue attending Sidwell.

66. Dr. Barden was aware of those facts, or was reckless in not knowing those facts, at the time he testified as a psychological expert on behalf of Newmyer on May 18, 2011.

67. Part of the malicious scheme to deprive Ms. Mehrbach of her children and to otherwise harm her involved a concerted effort to portray Ms. Mehrbach as psychologically defective and therefore less capable of taking care of her children than Newmyer.  The scheme involved demonstrating that Newmyer was the psychologically better fit parent and therefore should be in charge.  The scheme focused on painting Ms. Mehrbach's use of psychiatric medications including anti-depressants, anti-anxietals and sleeping pills as a "drug addiction" and Ms. Mehrbach's emails surrounding two nights in several years during which she wrote to her sister-in-law that she wanted to get "drunk" to numb the pain of Newmyer's betrayals as evidence of alcoholism.

68. After testifying that Ms. Mehrbach's use of alcohol to cope on those two incredibly stressful occasions demonstrated an alcohol problem, Dr. Barden then admitted he had never asked Newmyer about his own drinking habits and he affirmatively testified that Mr. Newmyer was not taking any psychiatric medications to his knowledge.

69. Newmyer's recently revealed psychiatric records from the 2010-2011 time period reveal that he was on a version of all of the same medications as Ms. Mehrbach, anti-depressant, anti-anxietal and sleeping pills during that time-period and was in fact taking higher doses and taking certain medications more frequently than was Ms. Mehrbach.  The medications included Ativan, Doxepin, Ambien 12.5, Ambien 10.0, and Remeron.  (See Newmyer psychiatric treatment notes attached hereto as Exhibit G.)

70. Newmyer's psychiatric treatment records from that time period also reveal that he was "fearful of his violent thoughts" and that his psychiatrist recommended more frequent sessions to Newmyer.  (See Exhibit G.)

71. In a deposition shortly before, and then during the May 18, 2011 temporary relief hearing Newmyer committed multiple counts of material perjury regarding his own mental health status and his use of psychiatric medications.

72. In a deposition conducted in March of 2011 in Chevy Chase, MD Newmyer testified under oath:

      6     Q.  Are you on any medications today?
      7     A.  No.  Vitamins, if that counts.

73. In the Court before Judge Smith, Newmyer falsely stated under oath:

BY MS. BENDECK:

20   Q.  Now, do you take any psychiatric drugs?
21   A.  No.
22   Q.  Have you ever been diagnosed with a
23  psychiatric illness?
24   A.  In 1994, I had a six-month sort of reactive
25  very mild depression to the -- maybe '93 -- to the

83

1  break-up with a girlfriend. I was upset for awhile.
2  I don't know if it was diagnosed or not.
3   Q.  Other than that, nothing?
4   A.  No.
5   **Q.  Are you concerned about the number and types**
6  **of drugs that you saw in her medicine cabinet?**
7   **A.  Yes.**

74. In his October 18, 2011 deposition, taken by Mr. Uno (then counsel for Ms. Mehrbach) in Florida, Newmyer falsely stated under oath:

BY MR. UNO:
20 Q. Do you currently take any prescription
21 medication?
22 A. Yes.
23 Q. What medication do you take?
24 A. I take 5 milligrams of Lipitor daily, and
25 that's all.
1 Q. Have you ever taken any prescription
2 medication for mental or emotional conditions?
3 A. Yes.
4 Q. What -- well, when did you take
5 prescription medications for a mental and emotional
6 condition?
7 A. During the period I referenced a minute
8 ago, approximately 20 years ago, I took a small daily
9 dosage of Zoloft for a period of a couple months, and
10 unrelated to that, I have taken a small dosage of
11 Xanax, very occasionally generally when I'm getting
12 on an airplane, particularly if it's overseas and I
13 want to sleep.
14 The Xanax usage is not nearly frequent
15 enough to be called episodic. Maybe one or two
16 tablets a year. If I'm either, as I said, nervous on
17 a airplane because I'm a nervous flyer or if I can't

13

18 get to sleep.

\* \* \*

4 Q. Do you have a current prescription for
5 Xanax?
6 A. I think at home I may have some of the
7 pills that I never took; in other words, they still
8 may be in the original bottle. Because as I said, I
9 generally don't see it, touch it, use it except for
10 an airplane trip or something of that nature. I
11 don't have a current prescription in the sense that
12 to the best of my knowledge, I haven't refilled the
13 prescription or prescribed Xanax in years, in recent
14 memory.
15 Q. Approximately how many years has it been
16 since you've been given a prescription for Xanax?
17 A. Many. At least five or maybe ten. In
18 other words, many years ago somebody prescribed
19 Xanax. I don't remember if it was my GP or who it
20 was that said, "Here, you want to sleep better, upset
21 about something, getting on an airplane and want to
22 sleep on the plane, take one of these." So I filled
23 it.
24 Q. Did you ever refill it?
25 A. I don't know. I have no recollection of
Page 93
1 refilling it.
2 Q. When is the last time you took Xanax for a
3 flight?
4 A. I don't know. I haven't taken Xanax in a
5 long time. I don't know when.
6 Q. Have you not taken Xanax for the period of
7 five to ten years?
8 A. Knowing me and airplanes, I may -- you
9 know, certainly in recent years I have no
10 recollection of taking it. You asked before -- you
11 were kind enough to treat me to your definition of
12 reasonable estimate, so I would say an reasonable
13 estimate is, I may have taken a small dose of, say,
14 Xanax three years ago.
15 Q. Did you ever drink alcohol when you took
16 Xanax?
17 A. Not that I know of. I don't believe so.

\* \* \*

9 Q. Other than the Xanax and Zoloft, have you

14

10 taken any other prescription medication for mental or
11 emotional health conditions?
12 A. During the first quarter of 2010, when I
13 became aware of Tara and Sidwell's conduct as it
14 related to LN, I was having some trouble sleeping.
15 I mentioned it to some doctor, and I don't know who,
16 who said I should try an occasional Ambien. I don't
17 even know the generic. So somewhere I have a
18 prescription for Ambien. I have used it, you know,
19 maybe five nights or ten nights in my life, I guess,
20 something like that. I have not taken it as long as
21 I can remember because I'm sleeping fine, and I don't
22 know where it is. But, yes, if you consider Ambien a
23 drug for mental or emotional purposes, then, the
24 answer is, yes.
25 Q. Have you taken any other prescription
Page 95
1 medication other than the Zoloft, the Xanax, and the
2 Ambien for mental or emotional health conditions?
3 A. Not that I can think of.

75. Dr. Barden, as Newmyer's expert psychological witness, then testified under oath
regarding the substantive medical differences between the image of mental health
portrayed by Newmyer versus that portrayed by Ms. Mehrbach and opined:

9     Q.   So then just let me ask you this.
10         Going to Mr. Newmyer, from your review of the
11    records, depositions, et cetera, is there anything
12    about him in terms of his family history, his use of
13    drugs or alcohol or anything else that is significant
14    to the Court in terms of poor judgment on decisions
15    such as school?
16     A.   To the best of my knowledge, Mrs. Newmyer has
17    a current active psychiatric diagnosis, which she has
18    to have to take these drugs.  I mean, I don't know
19    what it is and I'm not going to diagnose her, but if
20    she's going to testify, I'm very interested to hear
21    what she says, because she's got to have a diagnosis
22    to get those meds.
23         Mr. Newmyer testified he's not had a
24    diagnosis.  So let's see, psychiatric diagnosis versus
25    someone without one...
                              158

1     She's taking psychiatric meds, according to
2   these records; he's not, according to his testimony.

15

3   That's an easy one.  He's had kids that he got all the
4   way through school, into Harvard, Columbia and Oxford;
5   she has not.  I mean, these are pretty simplistic
6   things.
7       I'm not aware of Mr. Newmyer having any
8   significant emotional problems.  He does not seem to
9   demonstrate the kind of all or nothing black or white
10  negative thinking that she did, that we saw in the
11  video and some of the other deposition material.
12      He has a very long history of being successful
13  in a very stressful business world, which again -- and
14  her history is more limited, because she's a younger
15  person, but she just doesn't have the history that he
16  does of coping with a lot of high stress business
17  deals.

76. Dr. Barden made multiple material false statements to the court regarding
    Newmyer's mental health status.  Dr. Barden was aware of or was reckless in
    failing to be aware of the falsity of his testimony regarding Newmyer's mental
    health at that time and even when Newmyer later changed his testimony on his
    medication use, Dr. Barden did nothing to inform the Court of any impact such
    information would have on his conclusions, and what effect the awareness of a
    willingness to commit perjury would have had on his conclusions and
    recommendations.

77. Fisher, Bendeck and Fisher & Bendeck were aware, or were reckless in failing to
    be aware, of the falsity of the testimony offered by Newmyer and Dr. Barden at
    the temporary relief hearing, yet they did not correct the record and actually made
    affirmative use of the false testimony.  When Newmyer later changed his
    testimony on his medication use, Fisher, Bendeck and Fisher & Bendeck did
    nothing to inform the Court of the falsity of the prior testimony or make the
    perjury known to Dr. Barden, their expert witness.

78. The court relied on the perjury and fraudulent scheme in issuing its Temporary
    Relief Order.  The Court was clearly swayed by the false testimony presented by
    Newmyer regarding Dr. Huntington being LN's therapist.  Judge Smith was also
    swayed by the false and malicious testimony of Newmyer and Dr. Barden about
    Ms. Mehrbach's relationship with Dr. Huntington, and its effects on LN, Ms.
    Mehrbach's motivations for wanting LN to remain at Sidwell. The Court was also
    influenced by the testimony comparing Ms. Mehrbach's medicated decision-
    making abilities with the false Newmyer "medically clean" decision-making
    abilities regarding the children.

79. For instance, the "Temporary Relief" order from June of 2011 states the following
    findings of "fact" which were based on false testimony, or were based on no
    supporting testimony at all:

16

"Based on the evidence presented the Court finds that the father is well-suited to exercise ultimate decision making and is clearly acting in the children's best interests." ("Acting in the children's best interests" assumes that Newmyer's motivation for filing the Sidwell lawsuit and paying for its international dissemination was not malicious and fraudulent – an erroneous supposition.)

80. The scheme to deprive Ms. Mehrbach of her children and to otherwise harm her continued through the trial on the merits in the Florida family law matter.

81. During the custody trial, at page 355 of the transcript, when Dr. Barden explained to the Court why he recommended that the Court find in Newmyer's favor regarding education and medical decisions, Dr. Barden testified at length about Ms. Mehrbach's mental health. He then says, by stark contrast:

> Q. What are the factors that the Court should consider in terms of the father's request for ultimate decision making over education and some health issues?
>
> A. Well, like the mother, he's well-educated and intelligent. Like the mother, he has no criminal history that I saw anywhere. Unlike the mother, he does have a history of highly successful parenting...He has no current mental illness that I am aware of. He's not being treated by a psychiatrist that I'm aware of. He's not taking any psychiatric drugs currently that I'm aware of...

82. In the Court's Final Order adjudicating that Newmyer should have ultimate decision making over education and medical decisions (an Order drafted by Fisher & Bendeck and submitted prior to the entry of evidence) the Court states, at paragraph 29:

> The evidence presented at trial established that the wife suffers from various mental health issues which also justified awarding their father ultimate decision making with respect to education and medical issues. The husband's expert witness, Dr. Barden, identified for the Court numerous factors to be considered in deciding who should exercise ultimate decision making. Some of the factors he identified include the wife's poor judgment, her poor mental health, her admission she suffers from depression, her threats to kill herself, and the evidence that she has abused alcohol and takes many powerful prescription medications.

17

## PSYCHOLOGICAL MANIPULATION AND CONTROL OF MS. MEHRBACH

83. Newmyer maliciously psychologically abused Ms. Mehrbach throughout this process and continues to do so today.  For example, Newmyer put Ms. Mehrbach's former employer, a large DC law firm, on retainer for the Sidwell matter and told Ms. Mehrbach that the law firm was master-minding the Sidwell litigation.  In fact, the firm was not involved in the litigation and was only put on retainer to annoy and harass Ms. Mehrbach and to prevent her from seeking a return to employment at her former firm.

84. During 2010 and into 2011 Newmyer told Ms. Mehrbach repeatedly that she should expect that she was being followed at all times and made references in conversations to social engagements Ms. Mehrbach had attended with her boyfriend.

85. Newmyer then refused to answer questions during depositions about his surveillance that prevented Ms. Mehrbach from discovering material information that would have supported her claims in the Florida family matter.

86. Once discovery ended, and Newmyer had successfully avoided providing any facts about his scheme, such as the surveillance he had performed or caused to be performed on Ms. Mehrbach, he then lied under oath at trial, denying he had ever had Ms. Mehrbach followed despite the fact that Newmyer had come up with a nickname for the detective "Dr. Long Lens" and referenced Dr. Long Lens (or "Dr. LL") in conversations including emails.

87. Defendants Fisher, Bendeck and Fisher & Bendeck furthered the false and malicious scheme by writing, falsely, in Newmyer's trial brief:

> . . . the wife articulated a list of **delusional accusations**, none of which have any basis in truth and all of which are evidence about why important decisions involving the children should be made by the husband.  First, she claimed she was being "psychologically terrorized" by the husband hiring private detectives to follow her everywhere – but he has not hired private detectives.

(Emphasis added).

88. On New Year's Eve 2010-2011 Newmyer told Ms. Mehrbach she'd better be going somewhere good that night because it is expensive to have someone followed on New Year's Eve.

18

89. Newmyer told Ms. Mehrbach that the piece of litigation that his law firm, Fisher & Bendeck, did best was investigation.

90. Ms. Mehrbach, and friends and neighbors, often saw the "detective" outside her house and he made no effort to remain invisible. Newmyer's intent was for Ms. Mehrbach to know she was being followed, months and months after their separation, so that he could improperly control her behavior.

91. Ms. Mehrbach felt very threatened by the thought and presence of a detective following her because Newmyer had threatened to kill her.

92. Newmyer was caught at night going through Ms. Mehrbach's trash by Ms. Mehrbach's neighbor who was also her landlady.

93. When Newmyer was asked in March of 2011 about whether he had even had Ms. Mehrbach followed, or had told her that he had, he did not answer the questions about surveillance by stating that no surveillance occurred. Instead he refused to answer the questions about having Ms. Mehrbach followed and allowed his attorney to stonewall and answer on his behalf, thus thwarting legitimate and material discovery efforts.

```
 1        Q.    Are you having me followed?
 2        A.    In what time period?
 3        Q.    Currently, are you having me followed?
 4              MS. BENDECK:  If it's for purposes of
 5   litigation -- well, let me think what the rule is in
 6   Florida.
 7              (Discussion off the record.)
 8              MS. BENDECK:  I can't remember -- I
 9   can't remember what the rule is.
10              You know what, send me surveillance
11   interrogatories, and I'll answer them.  There's a
12   distinction about when you disclose what.
13              BY MS. [MEHRBACH]:
14        Q.    You acknowledge that you have had me
15   followed in the past, though?
16              MS. BENDECK:  Ever?
17              MS. [MEHRBACH]:  Yes.
18              MS. BENDECK:  In your whole marriage?
19              MS. [MEHRBACH]:  Yes, ever.
20              MS. BENDECK:  No, I'm not going to have
21   him answer that.
0160
 1              BY MS. [MEHRBACH]:
 2        Q.    Have you had me followed since August of
 3   2009?
```

19

> 4        MS. BENDECK:  That is the issue that I
> 5    told you I would rather you send me an interrogatory
> 6    or else I can get on the phone, because Florida has
> 7    specific rules about when and how you disclose
> 8    surveillance, and I want to follow that rule.  But I
> 9    will answer them promptly if you send it.

94. Newmyer's attorney, Ms. Bendeck, stated that she would produce "promptly" what was appropriate under the rules if Ms. Mehrbach sent a request for the surveillance information.  Ms. Newmyer did send a request for the surveillance evidence.  Ms. Bendeck never produced it.

95. Newmyer subsequently testified under oath that he had not ever had Ms. Mehrbach followed or told Ms. Mehrbach he was having her followed.

> 19 Q. Other than what Tara has said to you, do
> 20 you know anything about any surveillance put on Tara
> 21 at any time?
> 22 A. Yes. I know with more than a hundred
> 23 percent certainty that I have not engaged, nor paid
> 24 for, nor seen reports of, nor had anything on earth
> 25 to do with any surveillance of Tara whatsoever.

96. In August 2010, Mr. Newmyer, while refusing to tell Ms. Mehrbach where the children were going, took them on a plane from Maine to Florida for approximately 24 hours.  Ms. Mehrbach was extremely emotionally distraught about the secret flight that Newmyer was taking the children on because he had only recently been threatening to kill Ms. Mehrbach, had threatened their older daughter, and his own sister had stated that she felt that he had "lost it".

97. Ms. Mehrbach later learned that Newmyer took the children, then five and three, to Florida so that he could go to Bank of America to empty Ms. Mehrbach and Newmyer's joint safe deposit box without Ms. Mehrbach's knowledge or permission.  Emptying the safe deposit box was in direct violation of the parties' MSA at page 6 which states:

> The parties will cooperate in removing their property from the safe deposit box from Bank of America in Palm Beach Gardens, so that the box can be closed…

98. Newmyer, with the children in tow, surreptitiously removed, among other things, a diamond bracelet belonging to Ms. Mehrbach that was worth thousands of dollars and he closed the safe deposit box account.

20

99. When Ms. Mehrbach, then *pro se*, took Newmyer's deposition in March of 2011, Ms. Bendeck went to astronomical lengths to instruct/prevent her client from admitting to a crime relating to the "secret" trip to Florida under oath while questions were pending:

> 0130
> 1        BY MS. [MEHRBACH]:
> 2        Q.   Did you empty a lockbox that we jointly
> 3   had at Bank of America in Jupiter, Florida?
> 4        MS. BENDECK:  Does this somehow relate
> 5   to the kids?
> 6        MS. [MEHRBACH]:  It absolutely relates to
> 7   the settlement agreement, which is an issue.
> 8        MS. BENDECK:  I just don't think it is,
> 9   so I think we need to take that up with the judge.
> 10        MS. [MEHRBACH]:  Here, let me get you the
> 11   settlement agreement. I'll show you the provision
> 12   which relates to --
> 13        MS. BENDECK:  If you filed something
> 14   about that, you need to show me something that relates
> 15   to that issue. I don't remember you alleging anything
> 16   having to do with a lockbox in any of the many
> 17   pleadings you filed, but I could be wrong. I'm
> 18   willing to be informed.
> 19        MS. [MEHRBACH]:  This can't possibly be a
> 20   line of harassing questions. So while I'm looking for
> 21   this, can we proceed?
> 0131
> 1        BY MS. [MEHRBACH]:
> 2        Q.   Did you empty a lockbox that you and I
> 3   jointly held at a Bank of America in Jupiter?
> 4        MS. BENDECK:  Unless you want to answer
> 5   this question, I think this is again just harassing in
> 6   nature. There are no issues in the case that I am
> 7   aware of that this goes to.
> 8        So we can take that up with the judge
> 9   whether it's a proper subject, or you can try and
> 10   demonstrate to me what it has to do with the pending
> 11   issues.
>
>                          * * *
>
> 12        MS. [MEHRBACH]:  Odette, this is discovery.
> 13   I'm allowed to raise issues about anything relating to
> 14   the financial --
> 15        MS. BENDECK:  No, I don't agree.

21

16          MS. [MEHRBACH]:  It's also in my Complaint,
17  and we had --
18          MS. BENDECK:  I don't -- do you want to
19  show me in your Complaint where you talk about whether
20  the lockbox provision is enforceable?
21          BY MS. [MEHRBACH]:
0138
1      Q.    Here's how it relates to the children:
2  Did you take the children to the bank, Bank of
3  America, which I'm calling in Jupiter -- although the
4  agreement says Palm Beach Gardens, I believe it's in
5  Jupiter because it's across the street.  Did you take
6  our children into the safe-deposit-box room at Bank of
7  America in August of 2010?  You have to answer that
8  one.
9          MS. BENDECK:  I guess your children may
10  have been there.  So have your children seen where the
11  lockbox is?
12          MS. [MEHRBACH]:  I'm asking the questions,
13  please, Odette.
14          MS. BENDECK:  I'm telling him that it's
15  okay to answer, Tara.
16          Would you like me to not assist you in
17  that regard?
18          MS. [MEHRBACH]:  You were instructing him
19  how to answer the question.
20          BY MS. [MEHRBACH]:
21      Q.    Can you please answer the question?  Did
0139
1  you take our children to the Bank of America in August
2  of 2010 into the safe deposit room?
3      A.    Is that the question?
4      Q.    Yes.
5      A.    I don't remember.  I took them to the
6  bank.  I don't remember if they went in the safe
7  deposit room.
8      Q.    Did you go in -- did you go in the safe
9  deposit room when you had our children at the Bank of
10  America in August of 2010?
11          MS. BENDECK:  You know, I'm just not
12  going to do this.  Go on to another topic, and we'll
13  ask the judge whether this is a proper topic.
14          BY MS. [MEHRBACH]:
15      Q.    Do you recall having a bracelet of mine
16  that I was very upset about you having and I requested
17  having it back?

22

18        MS. BENDECK:  Same objection.
19               I don't know what this has to do about
20   the pled issues in the case.
21               MS. [MEHRBACH]:  It's discovery, Odette.  I
0140
1   am allowed to discover.  It has to do with whether he
2   believes provisions in the settlement agreement he is
3   seeking to enforce as valid are valid in his mind.
4               MS. BENDECK:  I take a different view
5   from you about whether the pleadings in this case
6   frame that as an issue for anybody to decide, much
7   less for discovery to be taken.

## EXTRA-JUDICIAL, NON-PRIVILEGED ABUSES BY DEFENDANTS FISHER, BENDECK AND FISHER & BENDECK

100.        Newmyer, Fisher, Bendeck and Fisher & Bendeck continued to inflict emotional distress on Ms. Mehrbach after the Florida family law matter had been finally adjudicated.

101.        On June 1, 2012, Ms. Mehrbach got a brief email while she was in Washington, DC, where she works, from Newmyer stating that LN was going to have a psychological evaluation performed by a Dr. Gerald Koocher, an expert witness for Newmyer in the Sidwell matter.

102.        Dr. Koocher was actually arriving in Florida that afternoon.  Dr. Koocher spent the evening with Newmyer and the children went to dinner with the Newmyers at Newmyer's beach front country club, and then spent the night in Newmyer's guest house.  Ms. Mehrbach was very concerned about the potential damage of such an unorthodox psychological evaluation on her young child, conducted without her mother there to comfort her, and conducted contrary to the Florida court's order regarding Newmyer's obligation to confer regarding medical and education decisions.  Ms. Mehrbach sent emails to Newmyer and Fisher & Bendeck clearly indicating her distress.  The emails were ignored for many days.

103.        Later, after the "evaluation" LN confided to Ms. Mehrbach that LN had told Dr. Koocher that she wished she could go back to Washington and Sidwell.  Shortly after the unorthodox evaluation, Dr. Koocher withdrew as an expert witness in the Sidwell case.

104.        Dr. Koocher was replaced as Newmyer's Sidwell expert by Dr. Alexander, LN's treating psychologist based in West Palm Beach, Florida.

105.        Ms. Mehrbach had been paying half of Dr. Alexander's treatment fees since spring of 2012.  Upon hearing that LN's treating psychologist was also going to serve as Newmyer's expert witness, Ms. Mehrbach wrote to Dr.

23

Alexander and to Fisher stating that it is ethically inappropriate for Dr. Alexander to be named an expert witness for a minor patient he is seeing in treatment.

106.    Newmyer's expert witness designation in the Sidwell case stated that Dr. Alexander would testify as follows:

> It is anticipated that Dr. Alexander will testify regarding the psychological and emotional well-being of L.N. Dr. Alexander is also expected to testify that L.N. has suffered and will continue to suffer psychological and emotional damage as a result of the acts of commission or omission by the Defendants. These damages may include, without limitation, emotional distress, humiliation, embarrassment and loss of enjoyment of life, as well as L.N.'s need for psychological counseling, therapy and treatment and the costs associated with providing such services to L.N.

107.    Dr. Alexander's dual role as treating psychologist and expert witness is ethically inappropriate according to the American Psychological Association Ethical Principles and Code of Conduct governing multiple relationships.

108.    Newmyer's false scheme, aided by his counsel and Dr. Barden included using false pleadings and orders obtained through fraudulent means in one court to influence decisions in another court.  For instance in Florida, Newmyer was arranging an unorthodox and surreptitious IME of LN, then 7, while at the same time in the Sidwell court in Washington, DC Dr. Barden submitted a declaration on behalf of Newmyer asserting that any psychological evaluation of LN must be conducted under precise conditions or the IME could inflict major psychological damage on LN.  (See Newmyer's Sidwell motion regarding the IME attached hereto as Exhibit H.)

109.    Dr. Barden asserted in his declaration that a proper psychological evaluation of LN for litigation purposes must be video recorded from beginning to end; must provide Mr. Newmyer with real time video or a two way mirror so that he or his representative could stop the assessment if it became "damaging" to the child; and must allow for Mr. Newmyer or his representative to halt the assessment if the video equipment malfunctioned during the assessment.

110.    Newmyer was successful in obtaining many restrictions on the expert evaluation of LN performed by Sidwell's psychiatric expert Dr. Brain on the urging of Dr. Barden's "expert" declaration in the Sidwell pleading.

111.    Yet when Newmyer conducted his side's expert witness evaluation of LN he failed to alert any of the Sidwell parties, and he failed to alert the child's mother until it was clearly too late for her to be present.  Newmyer failed to involve the mother in discussions with the expert witness and most importantly he failed to take any of the precautions that Newmyer's own expert

psychological witness, Dr. Barden, had declared under penalty of perjury were crucial to prevent trauma to the child. And Dr. Barden never testified that Dr. Koocher's examination had not been conducted on LN pursuant to his own criteria.

112.     Fisher & Bendeck's pleadings in the family matter, signed sometimes by Fisher, Bendeck, or Potter, are verbally abusive and often false. The pleadings routinely refer to Ms. Mehrbach as "extremely mentally ill" and have accused Ms. Mehrbach, falsely, of committing fraud in obtaining a mortgage.

113.     Fisher, Bendeck and Fisher & Bendeck caused entire Newmyer family court orders from Judge Phillips and Judge Smith to be published on their firm website (see screen shot attached hereto as Exhibit I) in order to maximize the public shame and embarrassment suffered by Ms. Mehrbach. Family court orders are supposed to remain private to protect the children.

114.     Ms. Mehrbach requested that Fisher & Bendeck take down the orders for the protection of the children who will eventually be able to read all of those false findings of "fact", as will the children's friends, as will the press when the Sidwell trial gets started. Fisher & Bendeck ignored the request.

115.     Ms. Mehrbach requested that Newmyer intervene to request that Fisher & Bendeck take down the orders from their website. Newmyer ignored the request.

116.     No other "notable" cases highlighted on the Fisher & Bendeck website has the full text of the Florida family court orders attached.

117.     Dr. Barden was aware of and testified in late 2011 that Ms. Mehrbach was suffering severe emotional distress and was having suicidal ideation as a result of the development of events in the Florida family law matter as well as the humiliation and embarrassment of the publicity surrounding the Sidwell litigation. Yet Dr. Barden continued to testify falsely regarding Newmyer's mental health. Newmyer continued to testify falsely. Fisher & Bendeck and its attorneys and staff continued the general fraudulent scheme of convincing the Court in Florida and in Washington, DC that Newmyer was the superior parent in terms of mental health and morals.

118.     Ms. Mehrbach, aware of the falsity of the testimony of Newmyer, Dr. Barden, the affiants, etc., and angered and frustrated by the Court being taken in by the fraudulent scheme time and time again, suffered a severe depression during the latter half of 2011. The depression was caused by and related to the wrongful separation from her children, the stress of the harm to her reputation, her financial woes caused by the nearly $1,000,000 in judgments Newmyer secured through false testimony in the Florida matter, the embarrassment and shame of the very public revelations regarding her private sex life, and the knowledge that the embarrassment and shame would forever follow her

25

daughters throughout their lives thanks to the very public lawsuit filed by Newmyer.  In January of 2012 she attempted suicide.

119.     The attempted suicide and subsequent psychological treatment did not have a calming effect on Fisher & Bendeck or its attorneys and staff, or on Newmyer.  On or about January 15, 2012, while Ms. Mehrbach was still in the hospital recovering from the suicide attempt, Newmyer went to Ms. Mehrbach's former home in Florida where her mother was staying while Ms. Mehrbach was in the hospital, and distracted Ms. Mehrbach's mother so that he could steal Ms. Mehrbach's cell phone, lock himself in the bathroom, and open emails in Ms. Mehrbach's gmail account.

120.     After the suicide attempt, Fisher & Bendeck was able to obtain an order requiring Ms. Mehrbach to have a psychological evaluation before she could resume unsupervised visitation with her children.  Ms. Mehrbach was cleared to have unrestricted timesharing with the children and the Newmyer family matter was officially closed by the Florida Court in late May 2012.

121.     On June 22, 2012, after the Newmyer matter was closed, Fisher & Bendeck wrote a letter to Dr. Atwater who had conducted Ms. Mehrbach's psychological evaluation.  The letter demanded that Dr. Atwater produce Ms. Mehrbach's psychological records.

122.     When Dr. Atwater, citing Ms. Mehrbach's right to privacy, refused to produce the records, Fisher & Bendeck served a deposition and document subpoena on Dr. Atwater dated June 28, 2012 despite the fact that there was <u>no pending family court matter pursuant to which Mr. Fisher could lawfully or ethically issue such a subpoena.</u>

123.     Fisher & Bendeck continues to make false representations to the court.  In a February 2013 pleading, in support of his motion seeking to once again get Ms. Mehrbach's psychiatric records, Fisher & Bendeck falsely stated:  "The former wife has restrictions on her timesharing with the children."  No restrictions on Ms. Mehrbach's time-sharing exist.

124.     In the summer of 2012 with no family law matter pending, Mr. Fisher filed a roughly 200 page bar complaint against Ms. Mehrbach arguing primarily that she was too mentally ill to practice law, that she had a drug problem (based on the presence of psychiatric medications in her medicine cabinet) and various other reasons.  The bar complaint was written and submitted on Fisher & Bendeck letterhead.

125.     Mr. Fisher's filing of the bar complaint was malicious, served no "family law" or "divorce law" purpose for which they were retained by Newmyer.  The bar complaint was intended to harm not only Ms. Mehrbach's psychological well-being, but also her ability to earn a living.  Ms. Mehrbach had to reply to the bar

complaint, and wait nine months to hear what the District of Columbia Bar would decide. Ms. Mehrbach was humiliated when she had to produce the bar complaint, full of extremely personal information, and false information and fraudulently obtained court orders, to her then employers.

126.     The malicious bar complaint filed against Ms. Mehrbach was recently dismissed without any action taken by the DC Bar. (See letter exonerating Ms. Mehrbach attached hereto as Exhibit J.)

127.     Ms. Bendeck also participated in intentional efforts to inflict emotional distress on Ms. Mehrbach.

128.     Ms. Bendeck took unethical and inappropriate acts in furtherance of the scheme to prevent Ms. Mehrbach from obtaining meaningful discovery in the Florida family matter on material issues.

129.     In an intentional effort to psychologically abuse Ms. Mehrbach, Ms. Bendeck wore Ms. Mehrbach's own wedding and engagement rings on her ring finger during the deposition of Ms. Mehrbach in early 2011. The rings had previously been turned over to Fisher & Bendeck to be held in escrow pending the final order in the divorce.

130.     Up until the past days and weeks, Fisher, Bendeck and Fisher and Bedeck continue to cause false pleadings to be filed to the court. Mr. Fisher stated in oral argument, and in fact the court found as a matter of fact, that Ms. Mehrbach had violated a sequestration order back in 2010 when she discussed her deposition testimony with Dr. Huntington. Ms. Mehrbach's deposition, conducted by Mr. Fisher, took place on August 19, 2010. Mr. Fisher waited until September 7, 2010 to request from Ms. Mehrbach's then counsel an agreed order on sequestration. Ms. Mehrbach had already spoken to Dr. Huntington in the interim prior to the entry of any order regarding the deposition testimony and Fisher and Fisher & Bendeck were aware of the falsity of that pleading when made and of the court's error in finding it as a matter of fact.

131.     Perjury is, pursuant to Florida statutes, a felony where a witness presents materially false information under oath. Mr. Newmyer did that in this case repeatedly. And he suborned the perjury of Dr. Barden, whether he knew it or not.

132.     Ethics rules governing attorneys require at 3.3, Candor to the Court, that when an attorney knows his client has committed perjury he must first try to get the client to set the records straight, and if that fails, the attorney must withdraw or make a disclosure to the court. Mr. Fisher had black and white, unambiguous evidence of his client's material perjury for over a month and he did nothing to correct the record. Not only did he fail to alert the court, he filed a motion for an order seeking to prevent Ms. Mehrbach from filing anything in family law court

anymore. And he won that motion even though the court also had the clear, written, undeniable evidence of the perjury.

133.     Case law and ethical rules govern attorneys' obligations to the tribunal where they know perjury has been committed. To permit or assist a client or other witness to testify falsely is prohibited by section 837.02, Florida Statutes (1991), which makes perjury in an official proceeding a felony, and by section 777.011, Florida Statutes (1991), which proscribes aiding, abetting, or counseling commission of a felony.

134.     Florida case law also holds that where an attorney allows his client to commit perjury and fails to rectify the situation, that perpetration of a fraud is outside the scope of the professional duty of an attorney and no privilege attaches to communication between an attorney and a client with respect to transactions constituting the making of a false claim or the perpetration of a fraud. *Kneale v. Williams*, 30 So. 2d 284 (Fla. 1947).

135.     During an April 23, 2013 hearing held before Judge Smith on an issue relating to Ms. Mehrbach's access to the mental health records of her daughter, Judge Smith had read the significant evidence of perjury that had been provided to the Court a month before and elected to do nothing about the perjury or about Mr. Fisher's failure to comply with any of his ethical obligations regarding withdrawal and/or disclosure of the testimony of which he was now aware to the Court.

## ADDITIONAL PERJURY AND ACTS IN FURTHERANCE OF THE SCHEME

136.     Newmyer engaged in numerous other acts of perjury, material omissions, and obstructionist efforts to prevent Ms. Mehrbach from achieving meaningful discovery facilitated a fraud on the court. Newmyer falsely testified under oath that he had no idea what the embroidered letters "NCD" on two shirts he had gifted Ms. Mehrbach and LN upon her acceptance to Sidwell meant and that he had never seen the shirts and did not know what NCD stood for. In fact, Mr. Newmyer had purchased and embroidered the shirts and "NCD" stood for "Negro Country Day" which was Newmyer's commentary on the diversity of Sidwell Friends School.

137.     Newmyer's perjury truly knew no bounds. Newmyer appeared at the first deposition in the Florida matter wearing sunglasses and insisted on keeping them on while inside the rooms where the depositions were taking place. From the transcript of the deposition of A. G. Newmyer III, September 24, 2010:

       7  BY MR. SASSER (attorney for Ms. Mehrbach)
       8      Q   Would you state your full name.
       9      A   Arthur Grover Newmyer, III.
       10     Q   And Mr. Newmyer, how old are you?

11    A   60.

12    Q   I notice you're wearing sunglasses.  Do you
13 have an eye problem.

14    A   Yes, sir.

15    Q   What's your eye problem?

16    A   My long-time eye physician has suggested to
17 me –

* * *

19    Q   Okay.  Do you wear sunglasses all the time?

20    A   No, sir.  They are uncomfortable when I
21 sleep.  I wear them during the day.

22    Q   Do you wear them all the time during the day?

23    A   Most of the time.

24    Q   Any time that you're awake, for the most
25 part, you're wearing your sunglasses?

6

1    A   There are times I don't remember to put them
2 on, and depends on how close I am to sunlight and
3 windows.  But generally, sir, the answer is yes.  I've
4 been advised to wear sunglasses, and I do.

* * *

9    Q   Okay.  And how long have you been suffering
10   from this situation where you have to wear the
11   sunglasses?

12    A   The doctor first found the condition a number
13   of years ago, I'm going to guess five, and each time I
14   see him, he reminds me that I should wear sunglasses as
15   often as possible.

16    Q   Okay.  But you also chose to wear sunglasses
17   during the -- your deposition in your first divorce,
18   didn't you?

19    A   That deposition was 23 years ago.

20    Q   Exactly.

21    A   I'm not sure I remember what I was wearing.

22    Q   Do you remember whether you wore sunglasses
23   or not?

24    A   No.

25    Q   Okay.  It's very possible you did wear
1 sunglasses, wasn't it?

2    A   Sure.  I don't remember the weather or the
3 brightness or anything else.  As I said, I believe it
4 was 23 years ago.  I don't remember what I was wearing.

29

138.     On March 2, 2011 Ms. Mehrbach, then pro se, took Newmyer's deposition and asked about the sunglasses again and Newmyer responded (interposed with multiple inappropriate obstructionist objections from Ms. Bendeck):

18     Q.   I want to circle back and clarify a few
19   things.  First, just for the record, I want to point
20   out that the deposition was called for 9:00 a.m., and
21   Mr. Newmyer and his counsel arrived at 9:15.  I'll
0080
1   also point out for the record that Mr. Newmyer is
2   wearing sunglasses during his deposition.
3          Would you like to discuss the
4   sunglasses, please?  Why are you wearing sunglasses?
5          MS. BENDECK:  I'm going to object,
6   because I believe in the first deposition you guys
7   went on and on about it, so let's do something new.
8          Oh, and I'll put on the record that
9   Kristin Henrikson, who is not admitted in Florida and
10   whom I did not consent to participate in the
11   deposition, is writing notes and participating in the
12   deposition in every way other than asking the
13   questions, as long as we're putting things on the
14   record.
15          BY MS. [NEWMYER]:
16     Q.   You just took your laptop out?
17          MS. BENDECK:  That's a question.  Answer

* * *

5     A.   Dr. Berler's advice is what I just said
6   Dr. Berler's advice was.
7     Q.   You said except at night, but you didn't
8   say indoors.
9          Did he say to wear your sunglasses
10   indoors?
11     A.   I believe that his advice is what I
12   testified his advice was, which was that I should wear
13   sunglasses at all times except at night.
14     Q.   Do you wear your sunglasses at all times
15   except at night?
16     A.   I wear them frequently.  I don't always
17   remember, and it depends on what I'm doing.  In other
18   words, I have a hard time reading the computer screen
19   with sunglasses.  You've seen me remove them today a
20   couple times to look at exhibits and so on.
21          I wear them a lot during the day.  I

30

0083
1  don't wear them all the time, but I would appreciate
2  it if you didn't tell Dr. Berler that I'm not
3  following his advice.

139.     Newmyer pulled the same perjurious stunt intended to disrupt the
proceedings at a deposition in his first divorce in 1987. The September 29, 1987
deposition transcript from that deposition transcript shows that Mr. Newmyer was
wearing sunglasses at that deposition as well, and that the deposition was aborted
because the bizarre conduct was deemed by opposing counsel to be too disruptive
to the proceedings to allow them to continue.

140.     When Newmyer completed his financial affidavit for the Family Court in
February 2011 he falsely listed the value of his penthouse apartment on
Pennsylvania Avenue in Washington, DC as $0. Likewise his waterfront home in
Frenchman's Creek, an exclusive gated country club community in Florida, was
valued at $0. His waterfront estate on several acres in Maine, according to a
document sworn to by Newmyer, was worth $0. And finally his guest house, a
three bedroom home in a gated community in Florida, also worth $0 according to
Newmyer's sworn affidavit. Newmyer also attested that his numerous
investments in a string of wildly successful real estate development funds run by
JBG in Washington, DC were worth $0.

141.     Newmyer suborned perjury from others in furtherance of his scheme.
Most notably, a friend of Newmyer's named Geoff Loree submitted an affidavit
(believed to be drafted by counsel for Newmyer) supporting Newmyer's Sidwell
Complaint in which he stated that during a week long visit to the Newmyer's
house in Maine, Mr. Loree noticed:

> .... a remarkable change in LN's demeanor and affect...I recall
> mentioning during that stay, to Mr. Newmyer, that LN seemed to be
> 'deprived of her childhood." Instead of having a carefree time in
> the Newmyers' idyllic lakefront setting, LN seemed less outgoing
> than before, more anxious, less engaged and engaging.

142.     Pictures of LN with Mr. Loree and members of Mr. Loree's family taken
during that Maine vacation time period clearly reflect that LN was carefree and
smiling.

143.     After fraudulently obtaining nearly $1,000,000 in judgments against Ms.
Mehrbach, Newmyer began aggressive efforts to seize Ms. Mehrbach's assets. To
date Newmyer has seized $20,000 in investments, $12,000 in jewelry, a home in
Florida in which Ms. Mehrbach had about $15,000-$20,000 in equity, and began
garnishing her wages 25%.

31

144.      Ms. Mehrbach was humiliated when Newmyer hired counsel in Washington to garnish her wages at her job in the summer of 2012.

145.      Ms. Mehrbach was again humiliated when Newmyer served a writ of garnishment on her employer on April 15, 2013.

146.      Ms. Mehrbach was humiliated when Newmyer hired counsel to enforce judgments against her real property.

147.      After years of litigation losses compounded by prevailing party fee awards amounting to nearly $1,000,000 in judgments, and due to Ms. Mehrbach's inability to find a permanent position because of her tarnished reputation, Ms. Mehrbach declared bankruptcy in December of 2012.

148.      Plaintiff, Ms. Mehrbach, spent hundreds of thousands of dollars on lawyers, legal costs, travel to and from Florida, and other issues related to defending against and attempting to uncover the fraudulent scheme.

149.      Ms. Mehrbach has suffered and will continue to suffer additional economic damages in the form of loss of income and earning potential, loss of retirement savings, loss of investments seized by Newmyer, loss of cash seized by Newmyer, loss of equity in a home seized by Newmyer, increased future costs of financing due to the bankruptcy, and other financial losses.

150.      Ms. Mehrbach also suffered and will continue to suffer non-economic damages including mental pain and suffering, from Defendants' actions, including, but not limited to distress caused by:

- The trauma of being separated in distance from her children;
- The loss of timesharing with her children;
- The trauma of seeing her children suffer emotional distress;
- The loss of reputation; and
- The loss of parental rights.

151.      All conditions precedent to this action have been met, satisfied or waived.

## COUNT I
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Defendants Newmyer, Fisher, Bendeck, Fisher & Bendeck, and Barden)

Ms. Mehrbach realleges and incorporates by reference the paragraphs above as though fully restated herein.

152.      Defendants Newmyer, Fisher, Fisher & Bendeck and Barden (the

"Intentional Infliction Defendants") deliberately and/or recklessly inflicted emotional distress on Ms. Mehrbach and her children.

153.     The Intentional Infliction Defendants' conduct was so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency and such behavior would be regarded as atrocious and utterly intolerable in a civilized society.

154.     The actions of the Intentional Infliction Defendants caused Ms. Mehrbach to suffer non-economic damages including mental pain and suffering including, but not limited to distress caused by:

- The trauma of being separated in distance from her children;
- The loss of timesharing with her children;
- The trauma of seeing her children suffer emotional distress;
- The loss of reputation; and
- The loss of parental rights.

**WHEREFORE** Ms. Mehrbach demands judgment for damages, costs and such further relief the Court deems proper.

## COUNT II
## CIVIL CONSPIRACY TO INTENTIONALLY INFLICT EMOTIONAL DISTRESS
### (Against All Defendants)

Ms. Mehrbach realleges and incorporates by reference the paragraphs above as though fully restated herein.

155.     This is a cause of action for civil conspiracy to inflict emotional distress on Ms. Mehrbach.

156.     All Defendants shared the common purpose to illegally and unjustifiably deprive Ms. Mehrbach of her children, to ruin Ms. Mehrbach's reputation, and to cause Ms. Mehrbach financial and emotional damage.

157.     As set forth in detail above, Defendants' fraudulent actions in furtherance of the civil conspiracy include, among other things, perjury on material issues, suborning perjury on material issues, improper obstruction of legitimate and material discovery requests in order to suppress discovery of material facts, providing false affidavits, making false representations to the courts of Florida and Washington, DC, publicizing false and salacious information internationally with the intent or recklessness as to whether it would harm Ms. Mehrbach and her

children, filing a 200 page meritless bar complaint, sending an extortionate letter to counsel for Ms. Mehrbach, and issuing and serving a subpoena for Ms. Mehrbach's psychiatric records despite the fact that no matter was pending before the court under whose authority Defendants purported to issue the subpoena.

158.     Defendants presented false "testimony" and information to the courts and intended the courts to rely on the fraudulent information in furtherance of Defendants' scheme.

159.     Ms. Mehrbach has been financially and emotionally damaged by the fraudulent scheme.

160.     Ms. Mehrbach's reputation has been injured by the unlawful actions of Defendants.

**WHEREFORE** Ms. Mehrbach demands judgment for damages, costs and such further relief the Court deems proper.

## COUNT VI
## FALSE LIGHT INVASION OF PRIVACY
### (Against Defendants Newmyer, Fisher, Bendeck, and Fisher & Bendeck)

Ms. Mehrbach realleges and incorporates by reference the paragraphs above as though fully restated herein.

161.     Defendants Newmyer, Fisher, Bendeck, and Fisher & Bendeck (the "False Light Defendants") caused false and malicious information about Ms. Mehrbach to be publicized internationally.

162.     Defendants' furthered their malicious tort by obtaining judicial orders based on false information and perjury, and then publicizing those false court orders on the website of Fisher & Bendeck. The False Light Defendants knew or had reckless disregard for the fact that the publicity surrounding the Sidwell litigation would cause the public to read those orders and to assume the truth of the information the False Light Defendants knew to be false.

163.     The malicious intent of the False Light Defendants is present and can be inferred from the fact that the Fisher & Bendeck website does not have links to other full text court orders on its website. The orders painting Ms. Mehrbach in a false and embarrassing light are the only family court orders linked on Fisher & Bendeck's website. Family court proceedings are supposed to remain private.

164.     Ms. Mehrbach has been financially and emotionally damaged by the actions of the False Light Defendants.

165.     Ms. Mehrbach's reputation has been damaged by the un-privileged actions of the False Light Defendants.

**WHEREFORE** Ms. Mehrbach demands judgment for damages, costs and such further relief the Court deems proper.

## COUNT VI
## INVASION OF PRIVACY
### (Against Defendants Newmyer, Fisher, Bendeck, and
### Fisher & Bendeck)

Ms. Mehrbach realleges and incorporates by reference the paragraphs above as though fully restated herein.

166.     Defendants Newmyer, Fisher, Bendeck, and Fisher & Bendeck (the "Invasion of Privacy Defendants") caused private facts about Ms. Mehrbach to be publicized internationally.

167.     Prior to the tortious acts of the Invasion of Privacy Defendants, Ms. Mehrbach was a private citizen.

168.     The Invasion of Privacy Defendants caused personal, private, intimate and embarrassing information about Ms. Mehrbach to be publicized internationally.

169.     The Invasion of Privacy Defendants knew or had reckless disregard for the fact that the publicity surrounding the Sidwell litigation would cause Ms. Mehrbach shame and embarrassment.

170.     Ms. Mehrbach's right to be free from the public gaze was violated by the publicizing by the Invasion of Privacy Defendants of embarrassing details regarding her personal life.

171.     Ms. Mehrbach has been financially and emotionally damaged by the actions of the Invasion of Privacy Defendants.

172.     Ms. Mehrbach's reputation has been damaged by the un-privileged actions of the Invasion of Privacy Defendants.

**WHEREFORE** Ms. Mehrbach demands judgment for damages, costs and such further relief the Court deems proper.

## COUNT VII
## ABUSE OF PROCESS
### (Against Defendants Newmyer, Fisher, Bendeck, Fisher & Bendeck)

Ms. Mehrbach realleges and incorporates by reference the paragraphs above as

35

though fully restated herein.

173.    Defendants Newmyer, Fisher, Bendeck, and Fisher & Bendeck (the "Abuse of Process Defendants") instigated and prosecuted the Florida family law "custody" case in bad faith for the purpose of extorting or coercing payment of money to the Abuse of Process Defendants, for the purpose of coercing Ms. Mehrbach's behavior, for the purpose of damaging Ms. Mehrbach's reputation, and for the purpose of extorting money and other concessions from Ms. Mehrbach.

174.    After the proceedings were instigated, the Abuse of Process Defendants manufactured evidence, omitted material facts, obstructed Ms. Mehrbach's access to material facts, made false representations to multiple courts, committed perjury, obtained perjurious testimony and affidavits from witnesses, and otherwise carried on a pattern of wrongful and harassing misconduct.

175.    The Abuse of Process Defendants' use of civil court proceedings for purposes of extorting money, coercing behavior, and/or damaging Ms. Mehrbach's reputation, was an illegal, improper and perverted use of the judicial process.

176.    Ms. Mehrbach has been financially and emotionally damaged by the unlawful use of the civil judicial system by the Abuse of Process Defendants.

177.    Ms. Mehrbach's reputation has been damaged by the Abuse of Process Defendants' unlawful acts.

**WHEREFORE** Ms. Mehrbach demands judgment for damages, costs and such further relief the Court deems proper.

## COUNT VIII
## MALICIOUS PROSECUTION
### (Against Defendant Jeff Fisher)

Ms. Mehrbach realleges and incorporates by reference the paragraphs above as though fully restated herein.

178.    Defendant Fisher instigated a nearly 200 page bar complaint against Ms. Mehrbach in the District of Columbia, alleging primarily Ms. Mehrbach's unfitness to practice law due to mental illness.

179.    The bar complaint against Ms. Mehrbach was not in furtherance of the family law matter for which Fisher had been hired so Fisher may not hide behind the litigation privilege.

180.     The underlying bar complaint terminated with a bona fide termination in favor of Ms. Mehrbach.

181.     Defendant Fisher was without probable cause to file the proceeding for these and other reasons:

> The Florida court rulings relied upon by Fisher in his bar complaint to assert Ms. Mehrbach's mental incapacity were obtained through fraudulent means, and Mr. Fisher took meaningful steps in furtherance of that fraudulent scheme;

> The bar complaint was not based on a good faith belief that Ms. Mehrbach was not fit to practice law, but was instead part of an unethical and fraudulent scheme, years in the planning and execution, to destroy Ms. Mehrbach's reputation and ability to earn a living;

> A reasonable lawyer would not have regarded the claims made by Fisher, in relation to Ms. Mehrbach's pro se representation in a Florida divorce matter, to be relevant to Ms. Mehrbach's fitness to practice law in Washington, DC; and

> Fisher's malice is present and can be inferred from his actions and words.

182.     As a further result of Fisher's actions, Ms. Mehrbach has been damaged by having to pay money to defend against the bar complaint, has suffered loss of reputation, lost employment opportunities, and suffered mental pain due to Defendant Fisher's wanton, reckless and retributive conduct.

**WHEREFORE** Ms. Mehrbach demands judgment for damages, costs and such further relief the Court deems proper.

**COUNT IX**
**DEFAMATION**
**(Against Defendants Newmyer, Fisher, Bendeck,**
**Fisher & Bendeck and Barden)**

Ms. Mehrbach realleges and incorporates by reference the paragraphs above as though fully restated herein.

183.     Defendants Newmyer, Fisher, Bendeck and Fisher & Bendeck and Barden (the "Defamation Defendants") caused the unprivileged publication of false statements concerning Ms. Mehrbach to countless third parties.

37

184.    The Defamation Defendants conveyed false information to the Florida family court, to the international news media, and to anyone in the press or the general public with access to the Fisher & Bendeck website.

185.    The Defamation Defendants' dissemination of false and libelous statements concerning Ms. Mehrbach has caused significant damage to her reputation and has prejudiced her in her means of livelihood.

186.    The Defamation Defendants' dissemination of false and libelous statements concerning Ms. Mehrbach has caused and will continue to cause significant emotional distress to Ms. Mehrbach and by proxy to her children.

187.    Ms. Mehrbach has been financially and emotionally damaged by the unprivileged actions of the Defamation Defendants.


**WHEREFORE**, Ms. Mehrbach demands judgment for damages, costs and such further relief the Court deems proper.


## DEMAND

Defendants Newmyer, Fisher, Bendeck and Barden and each of them did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and above-alleged agreement.

Defendants Fisher, Bendeck, Fisher & Bendeck, and Barden furthered the conspiracy by cooperation with, though lending aid and encouragement to and/or ratified and adopted the acts of Defendant Newmyer.

As a proximate result of the malicious, wrongful and non-privileged acts of Defendants herein alleged, Ms. Mehrbach has been generally damaged in the sum of $5,000,000 for emotional distress and the physical manifestations thereof for her own pain and suffering, and additionally for witnessing the pain and suffering endured by her minor children.

As a proximate result of the malicious, wrongful and non-privileged acts of Defendants herein alleged, Ms. Mehrbach has been generally damaged in the sum of $3,000,000 for damage to her reputation and the resulting loss of earnings and loss of earning potential.

As a proximate result of the malicious, wrongful and non-privileged acts of Defendants herein alleged, Ms. Mehrbach has been generally damaged in the sum of $1,000,000 in the form of current and future higher interest rates, banking fees and general lack of good credit as a consequence of having declared bankruptcy.

Ms. Mehrbach has been specifically damaged in the amount of approximately $350,000 as follows: amounts paid as fees to attorneys and as costs of litigation, Newmyer's wrongful garnishment of Ms. Mehrbach's wages, Newmyer's wrongful seizure of assets including $12,000 in jewelry, Newmyer's wrongful seizure of Ms. Mehrbach's equity in a townhouse in Jupiter, Florida, Newmyer's wrongful seizure of Ms. Mehrbach's investment in a private fund called Unipac.

Defendants individually and collectively did the things herein alleged maliciously and to oppress Ms. Mehrbach.  Ms. Mehrbach is therefore entitled to exemplary or punitive damages in the sum of $15,000,000.

**DEMAND FOR JURY**

Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff, Tara Mehrbach, requests that the Court issue an Order awarding her:

    A.  Actual damages,

    B.  Compensatory damages,

    C.  Punitive damages,

    D.  Attorneys' fees and costs incurred in bringing this action, and

    E.  Such further and supplemental relief as this Court may deem appropriate and just.

Respectfully submitted,

Tara Mehrbach, *pro se*
1010 25th Street NW #405
Washington, DC 20037
April 24, 2013
202-213-3404

## VERIFICATION

I, Tara Mehrbach, am the plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters that are alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in Washington, DC.

Tara Mehrbach
1010 25th Street NW #405
Washington, DC 20037
202-213-3404

DATED:  April 24, 2013

40

# CIVIL COVER SHEET

JS 44 (Rev. 2/08)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

**I. (a) PLAINTIFFS**

Tara L. Mehrbach

**(b)** County of Residence of First Listed Plaintiff  Washington DC
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Pro Se
1010 25th St. NW #405
Washington DC 20037
202-213-3404

**DEFENDANTS** A.G. Newmyer III, Jeffrey Fisher, Odette Bendeck, Christopher Barden, Fisher & Bendeck, P.A.

County of Residence of First Listed Defendant  Palm Beach
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

**(d)** Check County Where Action Arose:  ☐ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☒ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

13 CV 80412 Middlebrooks/Brannon

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☒ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus-Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Re-filed (see VI below)
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

a) Re-filed Case  ☐ YES  ☒ NO       b) Related Cases  ☐ YES  ☒ NO

**VI. RELATED/RE-FILED CASE(S)**  (See instructions second page):       JUDGE                   DOCKET NUMBER

**VII. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):   Diversity §1332

LENGTH OF TRIAL via  4  days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $            CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
SIGNATURE OF ATTORNEY OF RECORD   pro se    DATE 4/25/13

FOR OFFICE USE ONLY
AMOUNT 350.00   RECEIPT # FLS 9-232/AFP